UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>V.<br><br>DARRYL K. WILLIAMS,<br><br>Defendant. | CRIMINAL ACTION<br>NO. 7:16-15-KKC-EBA-1<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

When Darryl Williams caught word that he was under investigation for drug trafficking, he tried to stave off what he thought was an inevitable arrest by attempting to cooperate with local and federal law enforcement officers. Williams, with encouragement from his brother and friend, met with law enforcement on several occasions, hoping to avoid being charged in state court. Those attempts turned out to be for naught. After a few months, law enforcement became uninterested in Williams' help, and months later, a federal grand jury indicted Williams on charges of conspiracy to distribute Oxycodone. Williams now seeks to exclude from evidence the statements he made in those meetings. Because the statements in question were made in a non-custodial setting, and thus without the need for *Miranda* warnings, Williams' motion to suppress (DE 67) is **DENIED**.

I.

The Court conducted an evidentiary hearing on April 4, 2017. At the hearing, the United States called two witnesses: Kentucky State Police Trooper Zach Bryson and DEA Special Agent Ian Dalrymple. The defense called two witnesses: Pike County Jailer Freddie Lewis and defendant Darryl Williams.

1

***

Williams was at home when his brother, Mike, contacted him with information that Kentucky State Police Trooper Zach Bryson had received complaints that Williams was selling prescription medications. The information came from a good family friend, Pike County Jailer Freddie Lewis, with whom Trooper Bryson had discussed Williams' potential criminal activity. Although the stories are conflicting regarding events leading up to meetings between Williams and law enforcement, Williams met with Trooper Bryson at the Kentucky State Police ("KSP") Post 9 in Pikeville, Kentucky.

Jailer Lewis drove Williams to the Post because Williams had taken too much Oxycodone that day. On the way, Lewis told Williams that he needed to tell the truth. In Lewis' mind, the whole purpose of the meeting was for Williams to cooperate with Trooper Bryson. And that is what Williams did.

At the Post, Williams and Trooper Bryson spoke at length. Williams did not ask for an attorney, nor did anyone prevent him from contacting one. Trooper Bryson assured Williams that he was doing the right thing by talking. Trooper Bryson testified that at no point in the meeting did he threaten Williams with arrest, but he did tell Williams that it was in his best interest for him to tell the truth. In contrast, Williams testified that Trooper Bryson yelled at him about his alleged activities, but Trooper Bryson denies that any sort of tiff occurred between the two men.

Nevertheless, Williams provided Trooper Bryson with information related to a drug conspiracy and even touted his previous experience as a confidential informant. Williams expressed a desire to do the same kind of work for the KSP. To demonstrate his value as an informant, Williams showed Trooper Bryson a video on his phone of Williams making a controlled purchase when he was allegedly working at the direction of another officer. According to Williams, Bryson promised that he would face only state charges if he

cooperated. Trooper Bryson testified that he did not remember if he made such a promise, but recalls telling Williams that he would be serving as a cooperating witness to buy off major sources in the drug trafficking scheme Williams described. Trooper Bryson told Williams that he would reach back out to Williams. The meeting then ended and Williams left with Lewis.

Trooper Bryson was new to complex drug investigations, so he reached out to DEA Special Agent Gregory Bunch for help, relaying what he had learned from Williams at the meeting. Trooper Bryson then contacted Williams to set up a meeting with federal agents. Williams testified that he was reluctant at first, but agreed to meet, thinking that he had no choice to avoid arrest.

A few days later, on June 17, 2016, Williams, admittedly high on Oxycodone, went back to the KSP Post 9 to talk to law enforcement. There he met Trooper Bryson, and two other officers, DEA Special Agent Dalrymple and DEA Task Force Officer Brian Metzger.

At the hearing, there was some contention as to whether, upon his arrival, Williams was met outside by Trooper Bryson. Williams testified that Trooper Bryson met him outside of the police post and told Williams that he needed to tell the truth or risk being arrested. Trooper Bryson did not remember if he met Williams outside and walked with him into the office or if Williams walked in by himself. Trooper Bryson was certain, however, that he never told Williams that he would go to jail if he did not cooperate. SA Dalrymple testified that Williams met them at the door of the office and was invited in to talk. SA Dalrymple also testified that Williams was not searched, patted down or placed in handcuffs.

The June 17th meeting took place in Trooper Bryson's office, a small room inside a cinderblock building located behind the main KSP Post. The room, according to SA Dalrymple, was no bigger than thirty square feet with a few desks spread throughout, one of which was facing the door. Williams testified that the room was warm, but had a window air-conditioning unit. Trooper Bryson testified that the door to the outside was open for the

3

duration of the meeting. Trooper Bryson could not recall exactly what he was wearing that day, but recalled that no weapons were brandished at any point while he was present during the meeting. SA Dalrymple and TFO Metzger, who were working under cover, wore plain clothes and no indicia that they were law enforcement officers. They were armed, but their weapons were not visible. SA Dalrymple's badge was tucked into his wallet.

No *Miranda* warnings were read at the beginning of the meeting. SA Dalrymple testified unequivocally that Williams was not under arrest. SA Dalrymple stated that he informed Williams that he was free to leave at any time and that Williams was under no obligation to talk. SA Dalrymple testified that it was his practice to give those warnings at the outset of every meeting where a suspect is not under arrest and that he does so at the outset to specify the purpose of the interview. Trooper Bryson corroborated that SA Dalrymple informed Williams that he was free to leave at any time and was under no obligation to talk. Williams denies that he was given that instruction.

During the meeting, Williams laid out a great detail of information related to a drug trafficking operation. SA Dalrymple observed that Williams was open, honest, and engaged during the interviews, and was very confident about his ability to cooperate in the investigation. SA Dalrymple testified that Williams also described his past work as a paid confidential informant.

There is no evidence that voices were raised or that Williams felt uncomfortable during the meetings or that law enforcement officers controlled Williams in any way. Williams took smoke breaks during the meeting. Williams testified that he was permitted to go outside and smoke, but that he did not walk out of the sight of the law enforcement officers. There is no indication that the officers followed Williams outside or told him that he could not get up to go outside.

Williams was permitted to use his cell phone during the meeting. Although Williams testified that his cell phone was taken from him during the meeting, he admitted to using the phone openly during the interview. At one point, Williams made plans to meet someone at the local McDonalds for a meal afterward. Williams testified that SA Dalrymple urged him to eat because Dalrymple thought Williams was high. Although Williams testified that officers kept control of his cell phone during the interview, he admitted that he used it to make a call. SA Dalrymple testified to having no interest in Williams' phone at that time and that Williams' phone was never taken from him.

At some point, Trooper Bryson left the meeting, leaving the federal officers alone with Williams. During the entire meeting, Williams remained unrestrained, and after two to three hours, the meeting ended. SA Dalrymple testified that it was never his intention to effect an arrest that day. Williams left on his own with all of his personal belongings.

Several days later on June 24, 2016, Williams agreed to meet with SA Dalrymple again, this time at the DEA Office in London, Kentucky, a two hour drive from Williams' home in Pikeville. Because authorities were interested in using Williams as an informant, SA Dalrymple reached out to various DEA offices in different areas, indicating that Williams had information about a large scale drug trafficking scheme that reached into different states. Accordingly, other officers attended the meeting.

Williams arrived at the DEA office in London and was admitted to the premises through a large pressure sensitive security gate. Officers escorted him in through the back of the facility. Williams walked with officers through the secured facility, passing a few holding cells on his way to the interview room where several DEA officers, including SA Dalrymple, were waiting for him. Williams was patted down at some point before the meeting began, all in accordance with DEA policy. The interview room was small and cramped with people. The

door to the outside hallway was open and remained open throughout the interview. Williams was unrestrained, and none of the officers brandished weapons.

The interview began without Williams being read *Miranda* warnings. Like before, SA Dalrymple testified that Williams was told that he was free to leave at any time and under no obligation to talk. According to SA Dalrymple, Williams was not threatened with arrest if he did not talk, but Williams was told that it was important that he tell the truth because what was said during the interviews would be provided to the prosecuting attorney in the investigation. Williams proceeded to talk with law enforcement. During the interview, Williams' fingerprints were taken as part of the process to vet him as a potential confidential informant.

Williams testified that during the meeting, his phones were taken from him. SA Dalrymple did not take them himself, but stated instead that Williams' phones may have been searched. Williams later admitted that he signed various papers during the meeting and testified that he gave the officers permission to take the phones to download certain information, including certain text messages with a Virginia doctor. One of the two phones remains in the possession of law enforcement.

Like the June 17th meeting, Williams was permitted to step outside for smoke breaks. This time he was accompanied outside, but there is no evidence that Williams attempted to leave but was prevented from doing so by law enforcement. The DEA Office was secure and required accompaniment around the premises.

Between breaks, the meeting proceeded much like the previous one. SA Dalrymple recalled Williams being forthcoming and open, almost convivial in his demeanor with the officers and proud of his past work as a confidential informant. He allowed officers to search his phone and submitted to finger printing. There is no evidence to indicate that the meeting was anything but cordial and open. After a few hours, the meeting ended and Williams left

through the pressure-sensitive gate, without aid from any law enforcement. At no point were threats made to Williams, nor was he ever restrained or placed in handcuffs. At all times Williams was allowed to leave the interview room.

The DEA kept open its relationship with Williams after the two meetings, hoping to use him as a confidential informant. SA Dalrymple even met with Williams on another occasion in a parking lot where Williams provided him with more information. The relationship ended, however, when DA Dalrymple discovered that Williams was on supervised release for another federal crime, something Williams apparently had not previously disclosed. With their trust severed, law enforcement backed away, no longer willing to utilize Williams as a source in their investigation.

Williams was not arrested immediately after his relationship with law enforcement ended. Months later, on November 17, 2016, a federal grand jury returned a one-count indictment against Williams charging him with conspiracy to distribute Oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 846. (DE 1). An arrest warrant was issued for Williams on the same day. (DE 6). Williams voluntarily surrendered to authorities. Williams had his initial appearance on November 30, 2016, where he pleaded not guilty to the single charge. (DE 10).

He now has filed a motion to suppress all statements made to law enforcement officers during the June 17, 2016 and June 24, 2016 meetings and any evidence arising from those statements. (DE 67).

II.

A.

Williams seeks to exclude all statements he made to law enforcement officers during two meetings and "*any evidence* arising from said statements." (DE 67, at 1) (emphasis

7

added). Neither party discussed the implications of this request in their briefing or at the hearing, but the Court will do so here.

Williams bases his motion to suppress under the sole theory that his meetings with law enforcement officers on June 17th and June 24th occurred in a custodial setting and that he was not given *Miranda* warning prior to making those statements. Williams seeks to suppress not only all of the statements he made to law enforcement officers, but also any incriminating evidence derived from the meetings. However, even if officers failed to warn Williams of his right against self-incrimination, the physical evidence taken by officers is not subject to suppression. *Miranda v. Arizona*, 384 U.S. 436 (1966). *See United States v. Patane*, 542 U.S. 630, 639 (2004); *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005) ("[T]he ' fruit of the poisonous tree' doctrine does not apply to physical evidence seized as a result of a *Miranda* violation."). In *Patane*, the United States Supreme Court held that "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*," but that "[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Id.* at 641. Thus, "with respect to mere failures to warn" there is "nothing to deter," and so there is "no reason to apply the 'fruit of the poisonous tree' doctrine." *Id.* at 642.

Thus, as a threshold matter, no physical evidence obtained as a result of Williams' statements should be excluded from evidence on these grounds even if law enforcement violated Williams' *Miranda* rights.

B.

The crux of Williams' suppression motion rests on the following theory: at the time of the June 17th and June 24th meetings Williams thought the he would soon be arrested if he did not cooperate with law enforcement. Williams maintains that his fear of arrest created a

custodial environment in which *Miranda* warnings were required. Accordingly, he seeks to exclude all of his statements to law enforcement because he was not *Mirandized*.

Law enforcement officials are required to advise persons of their *Miranda* rights only before engaging in "custodial interrogation," *Miranda*, 384 U.S. at 444–45, meaning that in order for the rule to apply, the individual must be in custody and subject to interrogation. *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). Everyone agrees that no *Miranda* warnings were read to Williams before he was questioned, so the only question for this Court is whether officers were constitutionally required to *Mirandize* Williams.

*Miranda* rights need be read "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). To determine whether a person is "in custody" for the purposes of *Miranda*, courts look to "the objective circumstances of the interrogation . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Luck*, __ F.3d __, 2017 WL 1192899, at *3 (6th Cir. March 31, 2017) (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). The ultimate question a court must answer is whether, based on the totality of the circumstances, an interviewee's movement was restricted to a degree associated with a formal arrest. *Panak*, 552 F.3d at 465. The Sixth Circuit has laid out four non-exhaustive factors to guide the inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Id.*

<u>The June 17th Interview</u>

Applying the factors from *Panak*, Williams did not experience "the functional equivalent of formal arrest," *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), the day he met with Trooper Bryson, SA Dalrymple, and Task Force Officer Brian Metzger at KSP Post 9.

9

Only one factor, the location of the interview tips in Williams' favor, but the remaining factors make clear that the June 17th interview was not custodial in nature.

***Location.*** Police stations are inherently more coercive environments that a suspect's home or other environment. *United States v. Hinojosa*, 606 F.3d 875, 883 (2010) (citing *Panak*, 552 F.3d at 467) (finding that a suspect's home "generally does not present a coercive environment"). The cinderblock building behind the KSP building, however, was more neutral than a police station in that it consisted of only a few unsecured rooms. Any possible coerciveness was further ameliorated by the uncontested fact that the door to the facility remained open to the outside throughout the interview.

***The manner and length of the questioning***. Though the exact length of the interview was not made clear at the hearing, it undoubtedly lasted for a few hours.

All the testimony indicates the interview was mutually cooperative and cordial; the officers asked questions to which Williams willing obliged, detailing the information he knew and telling the officers about his past experiences as an informant. Williams was also allowed to use his cell phone and permitted to leave the room multiple times during the interview.

Williams suggests that the manner of questioning was more coercive than the United States lets on because of the size and temperature of the office. True, the office was small—by Dalrymple's estimation no bigger than fifteen by fifteen feet—and hot. But the meetings took place in the summer, and there is no indication that the officers purposefully created a hotbox in order to make Williams uncomfortable. Moreover, the door was open at all times, suggesting that the officers who were conducting the interview were less concerned with Williams leaving and more concerned with what he was willingly telling them about the alleged drug conspiracy while he was there.

In the end, the length and manner of the interview do not suggest Williams was in custody. This interview proceeded much more like a conversation than an interrogation.

***Restraint on the individual's movement***. It is undisputed that Williams had complete freedom of movement the June 17th meeting. Williams was not trapped in his seat, surrounded by law enforcement officers ready to apprehend Williams if he attempted to walk out. Williams got up during the interview to take smoke breaks. He walked outside of the Trooper Bryson's office, away from the officers who stayed inside. Not once did any law enforcement officer keep Williams from moving around in any way he wanted. Furthermore, Williams was not handcuffed, he was not restrained, and no one told Williams that he was under arrest. *See e.g.*, *Hinojosa*, 606 F.3d at 883 (finding no custody when "[t]he officers did not place Defendant in handcuffs or otherwise restrain his freedom"); *United States v. Brooks*, 379 F. App'x 465, 473 (6th Cir. 2010) (finding no custody when "no show of force was made, such as the use of handcuffs or the brandishing of a firearm").

One particular fact is telling in regards to this prong of the analysis. During the interview, Williams used his phone to make lunch plans for *after* the interview. No matter whose side of the story one believes—whether it is Williams' contention that the officers gave him is phone to make a call, or the officers' side that Williams was always free to use his phone—there is no doubt that Williams made the call and that he had access to his personal cell phone during the meeting. What's more, Williams contends that SA Dalrymple suggested he get food because of his apparent use of Oxycodone before the meeting. A reasonable person in that position—one who was allowed to (and apparently encouraged to) make lunch plans and not stopped from going—does not think that his liberty is constrained to such a degree to render him in custody. After all, making lunch plans presupposes that one is actually going to be free to attend.

Williams argues that he thought he was restrained because Trooper Bryson told him if he did not cooperate he was going to be arrested. Aside from the fact that Trooper Bryson denied giving Williams that ultimatum, Williams' argument is flawed for a couple of reasons.

First, Trooper Bryson, the only officer who even allegedly threatened Williams with arrest (at an earlier meeting), was not present at the end of the interview when Williams left, belying much of Williams' subjective concerns that he would be arrested immediately if he left the interview. Instead, for a good part of the interview, the only law enforcement officer who allegedly threatened arrest was absent, leaving Williams two federal officers, one of whom testified to having no interest in arresting Williams that day.

Second, the subjective intent of what at the officers knew or intended is only relevant in

> how a reasonable person in the position of the individual being questioned would gauge the breath of his or her "freedom of action." Even a clear statement from the officer that the person under interrogation is the prime suspect is not in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.

*United States v. Salvo*, 144 F.3d 943, 952 (6th Cir. 1998) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994). That reasoning applies to Williams' fear of arrest. Even if Trooper Bryson or any of the other officers told Williams that he was a suspect—therefore making Williams' arrest seemingly more imminent than it may have been—that is not in and of itself determinative of the custody issue. The question is not whether Williams feared he would be arrested. One would venture to say that most suspects have that fear on some level. The custody analysis focuses on whether the investigator used any incriminating evidence "to create a hostile, coercive, freedom-inhibiting atmosphere," *Panak*, 552 F.3d at 469, or, in this case, whether they used the threat of arrest to such an extent that his "freedom of action had been curtailed to the degree associated with a formal arrest." *Id.* at 468, 470. The evidence here shows that such a coercive, hostile environment did not exist.

***Whether Williams was told that he need not answer the questions***. The Sixth Circuit has noted that informing the suspect that he need not answer the question and is

12

empowered to leave "is a particularly important factor in showing no custody occurred." *Panak*, 552 F.3d at 467–68 (citing *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir.2006)).

There is contention on this point. Williams testified that he was never told that he did not have to answer questions. SA Dalrymple testified confidently and credibly that he informed Williams at the outset of the interview that Williams was under no obligation to speak to law enforcement. Trooper Bryson corroborated SA Dalrymple's testimony. The Court finds that Williams was not credible when he testified otherwise. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990) (asking courts hearing suppression motions to "indicate why they are crediting one party over another when the versions of what occurred differ in material detail"). Williams is a self-interested party, *see United States v. Lockhart*, No. 7:12–08, 2013 WL 1412338, at *4 (E.D. Ky. Apr. 4, 2013) (citing Sixth Circuit Pattern Jury Instruction 1.07, which directs jurors to consider whether the witness had "anything to gain or lose from the case"), who was admittedly high on Oxycodone during the meeting. This calls into question his ability to properly remember the meeting and his motivation for misremembering what he was told. Moreover, Williams met again with officers with no complaint or question. On the other hand, SA Dalrymple's telling is supported by what he testified to being a constant, consistent practice and is supported by another officer's testimony. SA Dalrymple's testimony is more credible on this point. Thus, the final factor heavily weighs in favor of finding that Williams was not "in custody" when he spoke to the officers.

Based on the totality of the encounter, the record shows that Williams was not in custody during this interview. Therefore, the Court does not need to suppress any statements made for lack of a *Miranda* warning.

June 24th Interview

Like the first interview in question, an analysis of the *Panak* factors establishes that Williams' second interview was noncustodial.

***Location.*** The London DEA office is inherently a coercive environment. Williams parked behind a large black gate, taken through the back of a secured facility, walked passed holding cells, and placed in a small interview room at a table surrounded by law enforcement officers. Williams was patted down before the interview began. There were more officers than there were seats, so additional seats had to be brought in. Taken together, these circumstances would certainly be more coercive than most.

***The manner and length of the questioning.*** The June 24th meeting's length of questioning and manner of questioning are not indicative of custody. The meeting lasted for a matter of hours, but, much like the first meeting. The span of time is attributable to Williams' willingness to provide officers with lots of information. Notably, the second meeting, perhaps more than the first, consisted of law enforcement efforts to vet Williams' capability as a potential confidential informant; that, after all, was the primary purpose of the meeting. Finger prints were taken along with detailed discussions of Williams' history. So while the length may have been substantial, the meeting consisted of efforts to allow Williams to help in the investigation, not solely to ascertain information that he had to offer.

Considering the type of information that was discussed, which in part was Williams attempt to cooperate, alongside how the interview was conducted shows goes a long way to show that Williams was not in custody. No officer brandished a weapon, and the meeting by all accounts was cordial and friendly. Williams even showed a great deal of comfortability with the officers in how he interacted with them and through his efforts to explain his experience as a confidential informant. This second interview had much more to do with what

14

Williams could offer law enforcement than with his own role in an alleged conspiracy. The manner of questioning, then, does not weigh in favor of a custodial environment.

***Restraint on the individual's movement.*** Williams' movement were more restricted in the London DEA office than in the KSP Post, but not in ways that tip the scale in finding of that he was in custody. Williams was not placed in handcuffs, or restrained in anyway. Like the first meeting, he was allowed to get up and go outside to take smoke breaks. Williams argues that he still was restricted even outside because he was accompanied by an officer. But, the DEA office is a secured facility, and it required that Williams or any visitor be accompanied when he decided that he needed a smoke so that he could be escorted back to the interview room. Restraining Williams to the extent that he could no wander around a secure facility is not the same as not letting Williams leave the interview whenever he wanted, like all accounts say that he was allowed to do. *See Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations and quotations omitted) ("Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*.").

What about the big black gate? It is true that Williams had to be "buzzed" in to the facility, but the evidence shows that gate was pressure-sensitive from the inside, meaning that Williams could drive out of the facility on his own, without any officer needing to let him out.

All secure buildings restrain one's freedom to move to some extent. But the fact that Williams was, again, allowed to get up and leave the interview without officer intervention shows Williams had a great deal of freedom during the interview.

***Whether Williams was told that he need not answer the questions.*** The same he-said, he-said contention over whether Williams was told he that he was free to leave and free to not answer questions exists here as it did over the first meeting. But as the Court

15

determined above, SA Dalrymple's account is much more credible. SA Dalrymple testified that he assuredly told Williams that he was free to leave and to not answer questions. SA Dalrymple did tell Williams that he should tell the truth and that anything Williams said in the interview would be reported to the investigating attorney. This is a far cry, however, from implying that Williams had to answer any question asked or that he could not leave. Informing an interviewee that he is free to leave is not a necessary condition to finding no custody, but it is a "frequently sufficient condition." *Panak*, 552 F.3d at 467. Even if it is not dispositive, that Williams was told he was free to leave as he had done previously weighs heavily in favor of finding no custody.

Taking all of the circumstances in their totality, Williams was not in custody during the June 24th meeting and his statements need not be excluded from evidence.

### III.

Like most cooperators, Williams was presented with what he saw a Hobson's choice: cooperate or risk imminent arrest. Williams chose to "stay out in front" of trouble with the law. Law enforcement happily obliged his decision. His encounters with law enforcement were voluntary and self-serving. The narrow analysis demanded by *Miranda* does not encompass Williams' broad theory of "custody." *Miranda's* prophylactic rule only applies under certain circumstances where a person is subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322. Subjective fear of being arrested at some uncertain moment in the future is not the same as objectively being "in custody" at the time of being questioned.

Ultimately, Williams asks this Court to answer the wrong question. The question is not whether he felt pressure to speak to law enforcement to avoid arrest, but whether he was forced to stay with law enforcement once he made his decision to meet and cooperate. *See*

*Panak*, 552 F.3d at 471. What kept Williams at those meetings was his desire to help himself, not law enforcement's desire to attest him. Williams has not made a showing to the contrary.

Accordingly, **IT IS ORDERED** that Williams' motion to suppress (DE 67) is **DENIED**.

Dated May 3, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY