UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>V.<br><br>DARRYL K. WILLIAMS,<br><br>    Defendant. | CRIMINAL ACTION<br>NO. 7:16-15-KKC-EBA-1<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

Defendant Darryl Williams filed a motion asking this Court to reconsider, DE 116, the Court's Opinion and Order of May 3, 2017, DE 91, which denied Williams' motion to suppress. On Tuesday, June 6, 2017, the Court held a pretrial conference and considered Williams' motion to reconsider. The Court, out of an abundance of caution, indicated it would consider additional testimony from Pike County Jailer Freddie Lewis before rendering a decision. *Id.* That rehearing was scheduled for June 19, 2017, in Pikeville, but was subsequently cancelled, DE 129, after Williams determined that Lewis "would be unable to provide any new and material evidence to the Court." DE 127, at 1. Accordingly, having dispensed with the need for additional evidence and argument, this matter is now ripe for review. For the following reasons, the Court will deny Williams' motion.

I.

The facts in this case have been told before. DE 91, at 2–7; *United States v. Williams*, No 7:16-15-KKC-EBA-1, 2017 WL 1731702, at \*1–\*4 (E.D. Ky. May 3, 2017). The Court

will only hit the highlights pertinent to the motion for reconsideration here. Kentucky State Police Trooper Zach Bryson received complaints from the community that Williams was selling prescription medications. Keen on investigating the matter, Trooper Bryson discussed what he knew with Williams' good friend, Pike County Jailer Freddie Lewis. Lewis talked with Williams' brother, Mike, and told him about Trooper Bryson's investigation. Mike told Williams about his conversation with Lewis, and, after some reluctance, Williams agreed to meet with Trooper Bryson. That same day, Lewis drove Williams to the Kentucky State Police Post #9 in his 2015 Chevy Tahoe, the same vehicle Lewis used to transport prisoners for the jail. Williams sat in the front seat. On the way to the KSP Post, the two talked about Trooper Bryson's investigation. For Lewis, "the whole point and reason of the [first] meeting at Post 9 was to try to [] go and try to cooperate because [Williams knew] what[] was coming." DE 107, p. 63, ¶¶ 5–8.

Williams and Lewis walked into the KSP Post together around 2:00 p.m. Trooper Bryson's office was located in a small room inside a cinderblock building that sat behind the main KSP Post. The room was no larger than thirty square feet. The summer-time heat warmed the room, but the office had a window air-conditioning unit, and the door to the outside was open for the duration of the time Williams and Lewis met with Trooper Bryson.

Trooper Bryson did not place Williams under arrest and did not prevent him from leaving the meeting. At no point did Trooper Bryson read Williams *Miranda* warnings. Williams testified that Trooper Bryson "chewed him out" about the alleged criminal activity. Trooper Bryson denies anything of the sort. No matter, the meeting proceeded informally. Williams was unrestrained and took several smoke breaks during the meeting.

2

Williams spoke at length with Trooper Bryson and provided information related to a drug conspiracy. Williams also bragged about his previous experience as a confidential informant and even showed Trooper Bryson a video on his phone of him making controlled purchases. Williams made it clear to Trooper Bryson that he wanted to do the same in whatever current investigation the trooper was conducting. Lewis was present during the meeting, but did not question Williams or otherwise participate. Lewis recalled "sitting there thinking to [himself] that [Williams was] doing the right thing . . . He [was] actually telling the truth, and he [came] out trying to get ahead of this." DE 107, p. 62, ¶¶ 6–10.

The meeting ended around 5:00 p.m. Williams provided Trooper Bryson with a good amount of information, so much so that Trooper Bryson reached out to DEA Special Agent Gregory Bunch for help, relaying to the federal officer what he had learned from Williams at the meeting. DE 107, at 13 ("I told Special Agent Bunch that basically, you know, I had a guy coming in to post who confessed to selling pills, to sponsoring people to go to a doctor, paying their visits, and for medication to be filled."). Williams was not arrested. Instead, Williams and Lewis went to the local Long John Silvers for a meal.

II.

Williams' motion for reconsideration does not dispute any of the legal analysis in this Court's previous opinion. He does not dispute the Court's finding that he was not "in custody" for the purposes of *Miranda* with regard to the June 17 meeting between Williams, Trooper Bryson, and two other officers, DEA Special Agent Dalrymple and DEA Task Force Officer Brian Metzger. DE 91, at 9–13. Nor does Williams dispute the Court's finding that he was not "in custody" for the purposes of *Miranda* with regard to

3

the June 24 meeting between Williams and DEA Special Agent Dalrymple at the London, Kentucky DEA office. DE 91, at 14–16. Instead, Williams' motion to reconsider zeroes in on the initial meeting among him, Trooper Bryson, and Lewis.[1]

Williams asserts that the "Court fail[ed] to recognize the fact that there were two law enforcement officers involved" when Lewis first drove Williams to meet with Trooper Bryson. R. 116 at 1–2. Williams argues, because Lewis drove him to the initial meeting with Trooper Bryson, that meeting became inherently coercive because Lewis had the ability to arrest Williams. DE 116, at 2 ("Indeed, Jailer Lewis was and is a peace officer with full powers of arrest."). In essence, Williams now argues that Lewis and Trooper Bryson "colluded" to get information out of Williams. This "collusion," as the Court understands the argument, transforms the initial meeting into a custodial interrogation requiring the suppression of all statements made to Trooper Bryson because they were made without Williams having been read any *Miranda* rights. Such a theory is unsupported by the facts and finds no refuge in the law. Williams' motion for reconsideration, DE 116, therefore must be denied.

A.

As an initial matter, this argument is not properly before the Court. Williams did not raise the prospect of a constitutional violation during the initial meeting among himself, Lewis, and Trooper Bryson in his original motion to suppress. Nowhere in his filings did Williams argue that the first meeting violated his constitutional rights. Instead, the original

---

[1] Nothing in the record clearly establishes the exact day of this initial meeting.

4

motion (and as a result, the Court's original opinion) focused solely on the June 17 and June 24 meetings.

"[C]ourts adjudicating [motions to reconsider] in criminal cases typically evaluate such motions under the same standards applicable to a civil motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e)." *United States v. Rowe*, No. 5:19-19-KSF, 2013 WL 3213079, at *2 (E.D. Ky. June 24, 2013) (citing *United States v. Canal Bridge Co., Inc.*, No. 4:07–CR–12–JHM, at * 1 (W.D. Ky. Mar. 4, 2009) (collecting cases)). A motion pursuant to Rule 59(e) may be granted if there is: "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir.2005). Rule 59(e), however, cannot be used to "re-argue a case" or "present new arguments that could have been raised prior to judgment." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008).

Williams presents no new evidence to this Court. In fact, he filed a notice informing the Court that Lewis had nothing to add to the original testimony he gave at the first suppression hearing. DE 127. Williams does not challenge any of the substance of the Court's initial legal reasoning. Instead, Williams asks the Court to reconsider a fact scenario it was not asked to consider and therefore did not address in its initial opinion. For this reason, Williams' motion should be denied.

B.

Nevertheless, even as a substantive matter, Williams' motion fails for two reasons. Williams first errs in his portrayal of what happened that day. Williams asserts that "[b]oth

5

Bryson and Lewis knew that Williams was in bad health," that "[t]hey picked a hot day" for the interview in a place where they intentionally left the door open "to allow air conditioned air to escape and sweltering heat to surround [Williams]." DE 116, 2. The rendition Williams lays out offers the incredible retelling that Lewis was not, indeed, Williams' friend who was trying to use his position within the law enforcement community to help a friend avoid serious legal trouble, but that Lewis was Trooper Bryson's operative who "colluded" with Trooper Bryson to lead Williams unwittingly into the spider's parlor[2]--all effectively creating a custodial environment for the purposes of *Miranda*.

This telling is not a fair treatment of the facts in the record. The meeting happened to be held in the summer time, but there is nothing to suggest that Lewis or Trooper Bryson picked the day because of the weather or that Lewis or Trooper Bryson intended to coerce a confession out of Williams by placing him in the small KSP Post. As stressed before, Williams decided to go to the meeting on his own volition, Lewis did not make him go, nor did Trooper Bryson. In fact, the whole point of the meeting was for Williams to help himself out to avoid arrest.

Williams knew of the investigation and saw meeting with Trooper Bryson as his best, if not only, option to avoid going to jail. Of course, Lewis suggested that Williams go meet with Trooper Bryson and drove him to the KSP Post, but there is no evidence that Lewis made Williams do anything, or that Lewis told Williams untruths to coax him into speaking with Trooper Bryson. Moreover, the evidence shows that Lewis' desire to see

---

[2] "Will you walk into my parlour?" said the Spider to the Fly. From *The Spider and The Fly: A Fable*, Mary Howitt.

6

Williams talk with Trooper Bryson was not based in an effort to see Williams placed in hand-cuffs, but quite the opposite. It was out of a desire to see his friend get out ahead of an investigation into Williams' alleged criminal activities. DE 107, p. 62, ¶¶ 6–10.

Regardless of how Williams recreates the facts, Williams' motion fails too as a matter of law. Nothing in the factual scenario that Williams alleges occurred or what actually occurred gives reason for the Court not to apply the same legal reasoning it used for the June 17 and June 24 meetings to this initial meeting. In other words, this motion to reconsider fails for the same reason the original motion failed. *Miranda*'s prophylactic rule only applies under certain circumstances where a person is subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). As the Court previously stated:

> To determine whether a person is "in custody" for the purposes of Miranda, courts look to "the objective circumstances of the interrogation . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Luck*, —— F.3d ——, 2017 WL 1192899, at *3 (6th Cir. March 31, 2017) (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). The ultimate question a court must answer is whether, based on the totality of the circumstances, an interviewee's movement was restricted to a degree associated with a formal arrest. *Panak*, 552 F.3d at 465. The Sixth Circuit has laid out four non-exhaustive factors to guide the inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Id*.

DE 91, at 9.

The *Panak* factors show that Williams was in no way subject to conditions associated with formal arrest. He was not hand-cuffed. *See United States v. Brooks*, 379 F.

7

App'x 465, 473 (6th Cir. 2010). Neither was he confined nor were his movements constrained in any way. The KSP Post was hot, and it is true that Williams requires an oxygen tank at all times, but Trooper Bryson kept the door open, and Williams was allowed to walk around and to go outside to take smoke breaks. Williams engaged in a long discussion with Trooper Bryson regarding his alleged criminal activity and extended an offer to become a confidential informant for Trooper Bryson. Part of what kept Williams in the KSP Post that day, then, was his own desire to stay and talk. Trooper Bryson did not read Williams his *Miranda* rights, but never did he indicate to Williams that Williams could not leave, nor is there any evidence that Williams tried to leave but was prevented from doing so. This evidence alone shows that Williams was not "in custody" during the initial interview.

    The heart of Williams' motion concerns not what happened during the actual meeting that day, though. Williams argues instead that, as a peace officer with the full power to arrest, Lewis' involvement in the initial meeting with Trooper Bryson placed Williams "in custody" while at the KSP Post. Specifically, Williams argues that, even if Trooper Bryson did say that he was free to leave or did not restrain his movement, he was still "in custody" because "he was only free to return to the jailer who had told him if he did not cooperate he would be arrested, maybe even that same day." DE 116, at 2. True, Lewis did inform Williams of Trooper Bryson's investigation. But, in context, these statements were much more innocuous than Williams argues. Lewis was a friend trying to help another friend out. There is no evidence that Lewis ever kept Williams from leaving the interview. If there were ever proof that Williams' theory that Lewis played a role in

8

coercing Williams to confess is baseless, all one need do is consider the fact that the two men ate a meal together after the meeting.

But more to the point, as the Court stated in its previous opinion, Williams' subjective view of the circumstances, even if based in fact, is largely irrelevant. Whether a suspect is "in custody" for the purposes of *Miranda* is based on an objective standard of reasonableness made to answer the question of whether, grounded in the totality of the circumstances, an interviewee's movement was *restricted to a degree associated with a formal arrest*. *Panak*, 552 F.3d at 465. Like the June 17 and June 24 meetings, Williams was not "in custody" for the purposes of *Miranda* at this initial meeting. A reasonable person in Williams' situation, given what he knew before he went to the meeting and what actually occurred at the KSP Post, would not have felt his movement was restricted to a degree associated with formal arrest. As this Court previously made clear: "Subjective fear of being arrested at some uncertain moment in the future is not the same as objectively being 'in custody' at the time of being questioned." DE 91, at 16; *see also Panak*, 552 F.3d at 471 ("The question in the end is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them.") (emphasis in original).

### C.

Finally, a close reading of Williams' motion to reconsider reveals that—putting aside the fact that it brings in a factual scenario not addressed in the original motion—this is not a motion to reconsider at all. Toward the end of Williams' motion, he cites *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994), to support his coercion argument. In citing *Ledbetter*, the Court construes Williams' argument to be, either in part or in full, not a

9

charge that law enforcement violated his *Miranda* rights, but rather that Lewis and Trooper Bryson violated the Due Process Clause of the Fourteenth Amendment by eliciting and coercing involuntary statements from Williams. Essentially, Williams now presses an entirely new motion, one with not only a new factual scenario for the Court to consider, but with a different legal theory to boot.

Williams' first problem is that a motion for reconsideration is an improper vehicle in which to raise new arguments that could have been raised previously. *Howard*, 533 F.3d at 475. That alone should end the inquiry.

Nevertheless, Williams' coercion theory fails here, too. A statement is involuntary if it results from interrogation techniques "so offensive to a civilized system of justice that they must be condemned." *See Ledbetter*, 35 F.3d at 1067 (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). The sole focus is whether the coercion flows from the police and not "moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (internal citations omitted). The Sixth Circuit has identified "three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir.1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

Little need be said with regard to this argument. If there were any coercion, it came not from law enforcement, but from Williams' own "moral and psychological pressures to

confess," *Connelly*, 479 U.S. at 170, to give himself the best chance to avoid being arrested, or to help himself out. Williams went voluntarily to the KSP Post, and he actively participated in the meeting, as evidenced by his willingness to show Trooper Bryson the video on his phone and his willingness to participate in any further investigation. The room was hot, and Williams' medical condition perhaps made him more susceptible to the heat than others, but the door to the outside was open and Williams was allowed to get up and walk around to take smoke breaks, all which militate against finding the KSP Post as coercive a place as Williams argues it was. Lewis and Trooper Bryson did nothing that could be described as "objectively coercive," much less did either do anything sufficient to overbear Williams' will or to be the crucial factor in motivating him to talk. Trooper Bryson met with a target of an investigation who voluntarily showed up at the police station. He conducted an informal interview and collected all the information he could from a man who willingly told him what he knew. Lewis did not misrepresent his intentions to Williams or conspire with Trooper Bryson to get a confession out of Williams. Lewis facilitated the interaction for no other purpose than helping Williams get out in front of the inevitable. Nothing about what occurred that day rises to the level of a constitutional violation.

### III.

The statements Williams gave that day were not born from law enforcement coercion, nor were they given while "in custody" to require the need for *Miranda* warnings. This case tells the story of a man who voluntarily walked into a law enforcement office at the behest of friends and family out of a desire to give himself the best chance to avoid the

heavy hand of the law. Unfortunately, Williams' plan did not work out the way he intended, and the evidence obtained during these meetings may be used at the upcoming trial. With no legal reason to suppress the evidence ascertained at the initial meeting (or the June 17 or June 24 meetings), Williams' motion to reconsider, DE 116, is **DENIED**.

Dated July 24, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY